Before we take a break, and so this case is In Re Tribune Company et al, number 18-2909. Messrs. Englert, Johnston, and Teitelbaum. As you're getting started, I thought this might be an area of law I might know something about. I'm not so sure after all this, reading all the briefs here. May it please the court. My name is Roy Englert. I represent one of the trustees, Delaware Trust Company, and I'm speaking on behalf of both trustees this morning. I'd like to reserve three minutes for rebuttal. That's fine. Subordination agreements are enforceable in bankruptcy. Period. Let me ask you a question. If the statute in 1129B1 says that notwithstanding 510A, one could argue that means that 510A is off the table, considering your crammed down analysis. But aren't you playing with fire here? Couldn't you also say that notwithstanding 510A means that you can do anything you want to a subordination agreement and bring it into play, which I'm sure is not what you want. In other words, it would seem from your perspective that you and I make a deal. We're both creditors. And I say Ambrose subordinates to Englert. And then we go through the analysis, and you get whatever you're supposed to get. I get whatever I'm supposed to get. But I subordinate to you, so I have to give money to you because I've subordinated to you. One could argue that's a side deal. Do you agree or disagree with that? It's a side deal. It may be enforceable specifically by Section 510A of the code. But what I'm saying to you is if you're saying that notwithstanding 510A, you can do the crammed down analysis. In other words, the crammed down analysis here, the crammed down, I shouldn't say analysis, completely supersedes. Do you really want to be making the argument that some court could say, hey, what that really means is I don't have to consider anything about subordination once I do a crammed down? No, not at all. Neither side argues that, Your Honor. I understand. I understand they're not making that argument. But I just wonder if there's, if you're saying the analysis at the outset should not include subordination agreements. I can see someday the kind of argument you're making, inviting a court to say, nope. It means that subordination agreements are fully in play, which it seems to be what you're arguing that the bankruptcy judge did here. It brought it into the analysis in terms of divvying up, taking monies from you and giving them to the trade and or retirees. Yes, that's our problem. That's one of our major problems with what the bankruptcy court did is it said the subordination agreement is off the table because of notwithstanding. And then it partially enforced the subordination agreement and analyzed it under the unfair discrimination prompt. That's illogical. And it substitutes a very mushy analysis for the bright line rule of Section 510A, which we submit should apply in crammed down. Why can't it be read so that notwithstanding how it would otherwise work, which would be 100 percent enforcement standing alone, that in the context of a crammed down, it's subject to the analysis under the crammed down, which is the way that the court here proceeded. That is, you bring it into the mix and you consider it as part of unfair discrimination. Do you do that analysis? Your Honor, Section 1129B, the crammed down section, consists entirely of additional safeguard for dissenting classes. The only provision of 1129A that is taken off the table by 1129B is Paragraph 8, the consent paragraph. But you know that there are some who say that's not quite the case, that what really happens is that fair and equitable, you go vertically, and unfair discrimination, when you go horizontally, replace subordination agreements. Replace what you do with respect to the enforceability of subordination agreements. That's the other side's argument. Understood. We disagree with it because it would be surpassingly strange, to quote Justice Scalia's opinion in Ravlax, to organize the statute by saying in 510A that subordination agreements are enforceable to the same extent as in non-bankruptcy law, and then to hide in 1129B not a protection for the beneficiaries of subordination agreements, but a modification of their rights in the notwithstanding clause. And there are other ways to read the notwithstanding clause, and in terms of bankruptcy policy, legislative history, the evidence is just overwhelming that this is not what Congress intended. Well, but Chapter 5 provisions apply across the code. There are a whole bunch of kinds of bankruptcies that aren't Chapter 11s, so why would it negate 510 to say for purposes of these cram-downs subordination agreements don't have full force? It wouldn't negate 510 and make it a nullity, but what it would do is make it a nullity in the cases in which it's most needed, in large corporate reorganizations, which are the cases. Your position is basically, Professor Cleese, which is this is really a bad idea. We ought to strike the notwithstanding clause in the cases in which they're most needed. That's a judgment on which people have disagreed, and this is where Congress came out. Well, Your Honor, since you mentioned Professor Cleese, footnote 70 of his contemporaneous article, Everything You Always Wanted to Know About Cram-Down, supports our position that not that this provision should be stricken, but that Congress never intended it to operate the way the district court and bankruptcy court in this case have held that it operates. Specifically, he says the notwithstanding clause means that to the extent a class of senior claims chooses not to enforce the subordination agreement, the minority in the class will be bound notwithstanding section 510A. And then he goes on to say the subordination agreement is enforced. This is every contemporaneous document, the House report, Professor Cleese's article, everything says that it was intended in 1129B that subordination agreements would be enforced. But according to the district court and the bankruptcy court, those three words, notwithstanding section 510A, mean that none of that can even be looked at. We have text, and then we have unexpressed intent. You're saying the unexpressed intent takes precedence over the text. Absolutely not, Your Honor, absolutely not. In the Radlax case, an opinion by Justice Scalia for a unanimous court, the court criticized as hyper-literal and contrary to common sense, the rule that had prevailed in this court by a two-to-one vote and in the Fifth Circuit, that credit bidding was not required under 1129B2. And Justice Scalia's use of the word hyper-literal is very interesting. What Justice Scalia said in 1988 for a unanimous court in the United Savings Association of Texas v. Timbers of Inwood Forest is that statutory interpretation is a holistic endeavor. And sometimes a provision in isolation that might seem to mean one thing does not make sense if read to mean that thing because of other provisions of the code. That's this case, Your Honor. It's not that we're running away from text. It's that the text of the bankruptcy code tells us that 1129A is the provisions that must be met in every case, every plan of reorganization. 1129B tells us the additional safeguards for descending classes of creditors. And from the text, not by running away from the text, we know that Congress could not have intended to take away this enormously important protection that subordination agreements are enforced. On your reading, how is that not surplusage? What remaining force does the notwithstanding clause have? The sentence I just read from Professor Klee explains exactly what force it still has, which is that if there are dissenting members of the class who do wish to enforce the subordination agreement, but the class, through a proper voting procedure, decides not to enforce it. Didn't he change his mind a tad in his 1995 article? He did not change his mind at all as to what the existing statute means. He said he had some different policy views in 95 than he had in 79, and he said courts have misinterpreted some of this language. But in terms of what 1129B and its notwithstanding clause mean, Professor Klee has been consistent. Now, Judge Bibas, I pointed to that sentence in the footnote of the 79 Klee article as one meaning of notwithstanding. But there's yet another meaning of notwithstanding, which we've addressed in our briefs, which is that the fair and equitable and unfair discrimination tests, if applied while ignoring the effect of enforcement of the Cram-Down Agreement, would seem to make things that are fair and equitable and are not unfair discrimination into unfair discrimination and non-fair and equitable treatment. And we think the notwithstanding clause also helps to explain, as the legislative history confirms, that one does take into account subordination agreements and their enforcement in applying the fair and equitable and unfair discrimination tests. It looks, I mean, it would seem to me that the stronger arguments that you might have are the ones you've made where you say that when the court took into account for Class I-E, the recovery under the plan, and then compared it for its recovery under subordination agreements, that's not supposed to be done. And secondly, that the court included the subordination amounts in the amounts given and attributable to the I-E class when comparing it with others. Is that correct? The court compared the 33.7. I'm asking, but what you're saying, the court made some errors. I was trying to see if I summarized correctly the errors that you claimed that it made in connection with what it did. In other words, if subordinated amounts are off the table, then don't include subordinated amounts when you do the analysis. Well, we contend the court made two errors. One, it should have enforced the subordination agreement in full. Second, in applying the unfair discrimination criterion, the court didn't compare the allegedly favored class to the allegedly disfavored class, which is what discrimination always means in the law. The numbers are there was 21.9 million in recovery from the estate. There was 11.7 in recoveries as a result of the subordination agreement. And then had it been fully enforced, there would have been another 2.3. They're saying it's less, but I get you. I know what you're saying. You're saying it would be 35.9? Yes, these are stipulated numbers. Okay, I got it. It's passing strange that when there's a bright-line rule that makes perfect sense, makes perfect bankruptcy policy, is consistent with the legislative history and is consistent with contemporaneous explanations of the code and can be justified by text, that instead the other side's position is, well, subordination agreements are enforced in bankruptcy. They always have been, but only by this wooly unfair discrimination test. It substitutes an unpredictable balancing test for the bright-line rule that the statute says outright in Section 510A, and this would be a disaster for the lending markets, which depend on predictability enforcement agreements. Just in terms of doing the analysis, I understand your argument to be that when you do the crammed-down analysis, you do not take the amounts that are allocated to you as a result of the subordination agreement to the crammed-down analysis. Is that correct? That's how you get to 21.9? We say you do take them into account, Judge Ambrose, but I think we're talking past each other a little bit. We say you take them into account because you see. But when you do the 21.9 over the 33.6, that's when you're saying there's a 53.4% difference, right? No, well, 33.6 over 21.9, actually 35.9. No, I'm sorry. It's 33.6. The analysis is the 21.6. 21.9. 21.9 is what we get. I'm not the math major. You were. That's true. The 33.6 is what the trade creditors get. So 33.6 divided by 21.9 is a 53.4% difference. Your position is that you do the crammed-down analysis before you would go about enforcing the subordination agreement, and then you enforce it in full, right? That's one way to put it, yes. Okay. So say we agree with you that that's the right order to do things and that it should be 100% when it's done after that analysis. Has any court here done then the proper crammed-down analysis? No. The bankruptcy in the district courts erred because they didn't fully enforce the subordination agreement. What would the remedy then be if there has not been an evaluation by any court along the way of what you would say is the proper way to go about evaluating the plan? The remedial question is addressed at some length in the prior opinion of this court when it held that this particular issue is not equitably moot, and simply taking away from Class 1-F what they were never entitled to in the first place is one way of doing it. Another way of doing it on the particular facts of this case would be to shift some interest in the litigation trust so that my clients are made whole. Is that still viable? Yes. Yes, the litigation trust is still litigating in the Southern District of New York in the Second Circuit. And how then should we think about the consequences of that? We have from the retirees a brief making the point that these are people, not faceless creditors, and that we're talking about retirees' income being perhaps disgorged. This again is addressed in the prior opinion of this court in this very case, saying if these amounts were not deserved to begin with, if they were not properly theirs to begin with, it may be unpleasant to have to give them back, but it's not inequitable. Let me go back. I'm just trying to get my arms around what the analysis would be. If you're saying that you were entitled to absent subordination, 21.9, and I think that's been stipulated too on JA 327, and the 33.6 is what I call the denominator, that represents what, that particular percentage? 33.6 I think is the numerator, not the denominator. 21.9 is the denominator. And 33.6, Your Honor, is what my clients get under the plan and what Class 1F gets under the plan. The plan was written so that each. Okay, that's what I thought. Okay. So there is an 11.7% difference, and you're saying that equates to a, you're doing most courts that I've seen, and I've been out of this game for a long time, do subtraction. There's 33.6 minus 21.9 equals 11.7. You're saying it's really almost a form of division, is it not? Yes, 11.7 over 21.9 is 53.4%. Your Honor, is there any case, I'm not saying that's irrational at all, but is there any case that supports that's the way bankruptcy courts, bankruptcy judges look at it? Yes, the Cross Creek case from the Bankruptcy Court in the Eastern District of Tennessee cited in our brief supports that. That analysis is done in that case. But again, my primary submission is the court should never reach that issue. My primary submission is the subordination agreement should simply be enforced and that lending markets depend on the enforceability of subordination agreements. So, okay, what I said to you at the outset, and I thought you gave me some pushback, I, there is an argument that subordination agreements between you and me are not for the court to mess with. In other words, we're not debtors or we're creditors in the case, but we have a side agreement. And I subordinate to you. So we go through the analysis, not taking into account the subordination agreements. And after that analysis is done, your class gets so much, et cetera, I'm probably part of your class because you do a horizontal, and I've agreed that I subordinate to you. So you get more money. But should that be taken into account by a court? I thought what you were telling me is no, you don't take that into account by the court in determining whether there's unfair discrimination. You only take into account pre-subordination agreement enforcement. Yes. Yes, phrased that way, I agree with that, Your Honor. Okay. And, again, there are examples of this spelled out in the legislative history. They're dense, but they're very dense. And as you know, Professor Markell called it the odious, which I wasn't even sure what the heck it meant, other than it's incapable of being effected in a way that makes sense. Well, Judge Markell's or Professor Markell's point in calling it odious was when we apply it in a non-subordination situation, it doesn't help us. But it's extremely helpful in a subordination situation, which is what we have here to understand how the fair and equitable and undue discrimination tests are applied. Could we step back to the remedy for a second? Because, as you point out, the law will be what it will be. But you also told us in your brief that you were not pressing the alleged misallocation of even $30 million involving the swap claims, just being significantly less, but you were bringing the appeal because of important issues of precedence that have significance beyond this case. If we were to agree with you, what is the actual disposition that you would ask this court to render? Is it a remand for some remedy to be worked out in the district court? Is it this court articulating with instructions what should be done on remand? Well, the court at 799F3rd, page 283, has spelled out the possible remedies on remand if we ultimately win this appeal. Not the appeal previously decided, but the appeal being heard today. And we are content with going back to the lower courts and advocating those remedies. With regard to the swap claim, we simply have abandoned the argument that the swap claim is not senior indebtedness. And there are lots of reasons to abandon that argument, but one of them is it doesn't have any precedential significance. It's just the construction of a particular language and a particular agreement. The issue whether subordination clauses are enforceable in bankruptcy has seismic significance in the lending world and is extremely important that the court decide it correctly, which we submit means holding that subordination agreements are enforceable in bankruptcy. Going back to my thing I keep harping on, so maybe the question is when do you believe courts should enforce subordination agreements? Always to the extent they're enforceable under non-bankruptcy law. That's pre-analysis of Cramdown, post-analysis of Cramdown. For purposes of applying the unfair discrimination test, the court considers the amounts without considering the subordinated amount. Okay. I think the same thing. Okay, thank you. Thank you. May it please the court, Jim Johnston on behalf of Tribune Media Company. I will cede three minutes to Mr. Teitelbaum on behalf of the retirees. The bankruptcy court did not clearly err in finding no unfair discrimination in Tribune's plan, which gives the trustees, retirees, and trade creditors the exact same recovery of 33.6 cents on the dollar. That's compared to 34.5 cents on the dollar that the trustees say they were owed. So we're talking about a difference in trustee recoveries of less than one cent on the dollar. But the plan, when it did its giving up, there were monies taken from what would have otherwise gone to the senior note holders via subordination agreements and given to so-called other parent claims. Is that correct? That's correct. The assumption in this case is that roughly $11.5 million was diverted from that subordination recovery to the retirees and the trade creditors. And if the argument is that not taking subordination agreements off the table, you would do your crammed down analysis without taking into account the subordinated amounts. So why should they go to the people who otherwise are beneficiaries of the subordination agreements? And you're saying, okay, it goes to them, and at the end of the day, there's so little amount, it's not unfair discrimination. That's correct. I guess my question at the outset is, are you allowed to discriminate at all with regard to, the question I asked of Mr. Englert was, in effect, if there's a side agreement that he and I have as creditors, and I agree to subordinate, why does that amount that otherwise would go to him get divvied up in part to other people? Because the statute specifically says you can do that. The statute specifically says you can do that. We submit that the provision of Section 1129B, the very first words that say notwithstanding Section 510A. And that goes back to the very first question I asked him. One could make an argument that what you're really saying is that not the subordination agreements are completely off the table and a side deal between creditors, but actually forget that. This is what really applies, and no matter what you do, as long as you don't unfairly discriminate, unfair discrimination, and I guess fair and equitable in certain cases, is the protector of those who have or are the beneficiaries of subordination agreements. So that's precisely our point. And it's perfectly in harmony with the purpose of the cramp-down provision itself, which is to enable a debtor in a bankruptcy court to confirm a plan over, call it an obstinate class, a holdout class, someone that's just saying no, no, no. In Chapter 11 cases, particularly a case like Tribunes, which was one of the most litigious, biggest cases of its time, there has to be some flexibility, some way for the enterprise to get out of bankruptcy, even over the objection of a dissenting class. And that's what happened here, and the bankruptcy courts determined that this plan, while it discriminated, it did not discriminate unfairly. And it was not unfair because the discrimination was immaterial under the circumstances of the case. Let's say there's ambiguity around the notwithstanding clause, and there's different readings that you and your colleague on the other side of the aisle give it, and we want to look to legislative history to try to lend some clarity. There's not, as many commentators have pointed out, the model of clarity. But isn't one thing we can take from the health report that it does seem to assume full enforcement of the segregation agreements with the examples that it gives? No, I don't think so, and I'll explain why. I will submit also that I had to look up ODIOS as well. I think this legislative history is a very good example of something that's clear as mud. But in the particular example at issue which the appellants cite to, it involved a plan where senior debt got a 25 cent on the dollar recovery, trade got 15 cents on the dollar, and the subordinated debt got zero. And the premise was that really the senior creditor should have gotten 30 cents on the dollar. So in that scenario, the senior debt recoveries declined by almost 17 percent from what they would have been with full enforcement of the subordination agreement. That's six and a half times more than the 2.6 percent decline here, or you can look at recovery percentage cents on the dollar recoveries here. In that case, the senior creditors went from 30 percent to 25 percent. That's five times more than the 0.9 percent decline in this case. And the legislative history doesn't support the argument that the court really should look at the increase in the retiree and trade creditor recoveries instead of the decrease in trustee recoveries, because in that example, the trade creditors got 15 cents, which is what they would have gotten in any case. So that example just focused on difference between senior and junior creditors. Our case is looking at the creditors in the middle. Creditors in the middle did a little better, but the senior creditors did infinitesimally worse, and it was immaterial and therefore not unfair. But those examples do seem to suggest that they're all or nothing kinds of examples. They don't reflect, as you're suggesting, that you could look to different gradations to make the determination about unfair discrimination. It's just there is or there isn't. And there's unfair discrimination where the senior creditors were deprived of the full amount. But I submit that the legislative history doesn't say that. They give an example that is material and therefore unfair. So in that case, yes, it was all or nothing, but there is no example of a case like this one, where the deviation from the subordination agreement is small and therefore not unfair. Professor Markle also takes the approach that the enforcement of the subordination agreement should be done outside of the analysis under the Cramdown plan. At one point, he says that. I'm not sure at another point. That's how odious the whole thing is. And the Professor Markle analysis, which was adopted by the district court in Armstrong and has been picked up in the lower courts, is really the gist of it is exactly what the bankruptcy and district courts did here at large, which is looking to see if there's a grossly disparate recovery. And there was no grossly disparate recovery. It all goes back to the word unfair in the statute. That is by nature a fact specific inquiry that hinges on materiality. We just don't have the materiality. Let me give you. Can I just while we're on that? And their argument on the case for the other brief is subordination. Recoveries must be excluded from the discrimination inquiry. Do you agree with that in terms of the inquiry? No, I don't think it's that simple. As we said in our brief, the subordination. But why would you take sounds like me when he says you'd look at twenty one point nine versus thirty one point six. And if that's irrespective or despite. If notwithstanding means despite or in spite of the subordination, the subordination agreements, then you do this particular crammed down analysis. Why is that statement not correct? Subordination recoveries must be excluded from the discrimination inquiry. I think the way we put it in our brief is that the subordination analysis is relevant. It goes into the mix of things that cause that. Well, that's what happened here. Right. But let's assume for the moment it is twenty one point nine versus thirty three point six. How do you go about determining what the differential is? Is it eleven point seven or is it a fifty three point four percent differential? Right. They played a little word games in their brief. We submit that if you do the analysis that all the courts have done looking at unfair discrimination, it's eleven point seven cents. You compare the trade creditor recoveries of thirty three point six cents against the pre subordination recoveries of the trustees of twenty one point nine. And it does look like that's what courts have almost always done with one possible exception of a court in Tennessee. But is that the right analysis? Well, you can back into the math and do it the other way. Reading the case law and we tried to do this in our brief as well. If you say that, well, in this case, the trade got a fifty four percent higher recovery because of this alleged discrimination. The cases don't speak of that kind of percentage increase. But if you go through and you do the math and you look at the percentage increase of those cases, they're all one hundred percent or more. And I think we put a table in our brief that tried to demonstrate that. So you can either look at decrease in cents on the dollar recovery or you can do a comparison and say this class got X percentage higher. But if you're looking at X percent higher, you're looking at one hundred percent or more in every case that's found unfair discrimination. Whereas they say this case is fifty three percent. But when you. OK. Continuing on with the analysis. When you do an unfair discrimination analysis, isn't it one class versus another class? To be E versus F in this case. I think that is the baseline analysis. But it looked like the court here compared the recovery of E. That's Mr. Wrangler's clients client under the plan to their recovery under subordination agreements. That doesn't is that that doesn't appear to be correct. Well, what the court found was that the discrimination here, once you apply subordination, results in an immaterial impact on the trustees. So in that sense, that's what the court was doing. But if you go back and you look at the pre subordination distributions to the retirees versus distribution to the note holders, the result is still immaterial for the reasons I just discussed. And if you ever do get to the unfair discrimination analysis, what test or what as to what test you should apply? Where do you come up? I think you look at it both ways. I'm talking about in terms of you've got the Aztec and Bank test. You've got another test. In this case, you've got the Markel proposal. You've got the City Bar of New York 2002 proposal. We agreed below that the that the Markel test was the appropriate test because it had been adopted by the district court in Armstrong prior to Tribune. I believe that the appellants agree with that. I don't know of any federal appellate court that's actually done that. The Markel test is a sensible test. It looks for grossly disparate treatment of the class, and we don't have that. The City Bar of New York City Bar reported 02 thinks there needs to be some clarification in order not to have too much flexibility placed into the hands of bankruptcy judges. Do you have you read? Have you read that report? Not recently. I would submit, though, that I disagree in that. Why else would Congress use the word basically text the Markel proposal and just add some new ones to it? But it is inherently fact specific. As the bankruptcy court held in this case, unfairness has to take into account all the circumstances of the case, all the circumstances of the plan. And that's what happened here. Is there any dispute here as to whether the plan reflected unfair discrimination outside of the allocation of the subordinated funds? In other words, if we were to conclude that the enforcement should be done after the factors separate from the crammed down analysis, is there any argument here that the plan putting aside the subordinated funds was was unfairly discriminatory? Would we need to even reach the what the standard is and how you go about evaluating unfair discrimination? I don't think so. But we have a disagreement with the appellants. We think that even if even if you do, as Judge Ambrose suggested, and you look at unfair discrimination, pre enforcement of subordination, this plan did not unfairly discriminate under any test and under any of the cases that have actually found unfair discrimination. So I think that's what you're asking. The remedy question I was asking my colleague. Again, if we did not agree with you, what what do you view as the proper remedy from this court? There would have to be a submit a remand because there's still quite a bit of wood to chop in the bankruptcy court. If, in fact, this panel determines that the plan did unfairly discriminate. For example, and you heard this this morning in the equitable mootness decision, there was a suggestion that a remedy could be fashioned without taking money out of the retirees pockets by reallocating litigation trust the waterfall distributions. But in fact, that litigation trust has made a lot of distributions to date. And so maybe those those things cannot be reallocated. More importantly, Mr. Title Bomb will tell you that he's reserved the right all the way along to argue that his clients are not even subject to that subordination agreement. And they're entitled to get the same pour over from the subordination agreement that the bondholders did, that the trustees, even though they're not a party. Oh, correct, because when you read the definitions in the subordination agreement, it applies to many other non parties. And the only carve out is for ordinary course trade payables, which retiree obligations probably don't don't fit into. So there would have to be a litigation over whether that subordination agreement applies to the retirees and whether they could benefit, which would then make this a case of less than a million dollars of trade credit recoveries. So there is a significant amount of work that still would need to be done in the bankruptcy court. If, in fact, you reverse, we submit that for all the reasons that I mentioned in our brief, that you should not reverse and that the bankruptcy court and district court got it right. Thank you very much. Thank you. Thank you. May it please the court. Jay title down for the approximately 200 retirees that filed claims in this case for one hundred million dollars for deferred compensation. That was put into deferred compensation retirement plans. And I appreciate being given a couple of minutes here to put a face, if you will, on some of the 200 retirees that I've represented for the past 11 years since the filing. Almost, I think, 20 of which have passed on during the course of this case. But if I may. What is the principal argument you're making to us that the money's been distributed? For God's sake, don't send it back to to ask for a disgorgement. Is that it? There's there's two pieces and that's one. So in 2012, December of 2012, as a result of a settlement reached, which the bankruptcy court determined was an integral part of the reorganization, the retirees negotiated down and gave up ten million dollars of their claims, had an allowed claim of ninety eight million dollars in change and accepted that pursuant to a plan, there would be a distribution of thirty four cents on the dollar to that class of claims. And in consideration of all that, we supported the plan. We worked with everybody in 2012. What percent of that thirty four cents or thirty four percent came from the subordinated coordination agreements? Well, the the the argued amount, I think, is eleven million dollars for the class. I don't know the exact amount from up for my group. It's something some a bit less than that. But but here's here's the point. In December 2012, thirty five million dollars was distributed to the retirees. As this court knows, there was no stay. There was no bond. There was no nothing. That money went. People tried to move on with their lives. As your honor asked, what's the remedy? And Mr. England said, well, not a big deal. We can reallocate the trust proceeds. There's a significant problem with that. Not everyone in class F1F opted into the trust. In point of fact, only eighty four retirees. Thirty five million dollars opted into the trust. The rest took it. Sounds like an argument. If this case goes back that you would make to the bankruptcy court, is it not? Well, it is an argument that if this case that should have to go back, it is one. Just like the issue that we raised, frankly, in the bankruptcy court, which was not decided. It was brief and not decided that we are not that we are senior indebtedness and not subject to the subordination. And the reason for that argument was all my clients were retirees of Times Mirror, which carried our obligations as a long term liability on its books, which obligations were then assumed by Tribune at the time this interparty agreement was out, was entered into. So we're not subject to it. So, you know, this is a case which has spawned over half a billion dollars in legal fees already. Five times what my clients would have been paid to get paid in full. What we are asking this court is to and we've supported, obviously, the analysis. Put it this way, Mr. Englert is asking for a bright line test. Your Honor, Judge Ambrose, you know better than all of us here bankruptcy is not about bright line. It's not. No, no. I forgot everything I knew. But it's about equity. It's about getting companies out of bankruptcy, saving jobs, keeping keeping the economy viable. That is not done by checking a box. And that's what happened below. The judge applied the statute, used his equitable consideration and determined that this eleven, twelve million dollars, while a lot of money, is over one point two billion dollars of LBO claims, immaterial, irrelevant. And the benefits outweighed the discrimination, but not unfair discrimination. But even if that's so in this case, isn't the point that if subordinated funds are no longer going to get full enforcement, as was the expectation of lenders, and it's going to be swept up into a crammed down analysis, that we're turning the capital markets on their head? I don't buy that. And the reason I don't buy that is because if that's the rule, they adjust. They charge more to one another for entering into these transactions. Look, those arguments were made, for example, in the context of 1129, where you can't modify a home mortgage, for example. Or in railroad reorganizations or airplane reorganizations where you can't change lease terms. But the reality is when cases and bankruptcy cases have evolved over the time as a result, for example, of the mortgage crisis, and we have the whole loan modification process, everyone screamed, and I represent banks for 30 years, oh my God, no one's going to lend any more money, any more, ever again, to home lenders. That didn't happen. And there's no evidence that will happen. It's easy to be their chicken little and say the sky is falling, but there is not a scintilla of evidence that that won't happen. What is more likely than not to happen is they will adjust. They will adjust their interest rates, they'll adjust their risk analysis, and they'll keep making these loans as long as they can keep making money. What about the predictability of knowing what will be considered unfair discrimination? Well, and I believe there is predictability as set forth in the Tribune brief. They've put together a chart. I think like most things in bankruptcy, there are things that are clearly not discriminatory. There are things that are clearly are. And then you're going to have a little bit of gray and a little bit of wiggle room. And that's just unfortunately the nature of the beast of bankruptcy. It's not always black and white. And for a good reason. Henry Goodman, my mentor, told me bankruptcy is the practice of law with one leg up, meaning you're sitting at the side of the table and you get a deal done. The way deals get done in bankruptcy is there's an element of unpredictability, and that's what fosters compromise. If everyone knew exactly what their positions were, we wouldn't need the judges and we wouldn't need the courts. And we wouldn't be able to have the bankruptcy process that we have today that does so much good in fashioning equitable remedies for creditors and for organizations and for society. Your Honor, I've gone way over my three minutes. Thank you. Thank you very much. Certainly brought out a name from the past. Yeah. No bullshit. Mr. Engler. I cannot emphasize strongly enough that the bright line rule for which I advocated comes from the bankruptcy code itself. Section 510A states a bright line rule. Section 1129A1 states an incredibly important bright line rule that every confirmed plan, whether through cram down or not, must comply with all applicable provisions of the bankruptcy code. So that includes 510A. The only textual issue is whether the notwithstanding Section 510A clause at the beginning of 1129B1 somehow negates 1129A1, even though 1129A1 is not mentioned, whereas A8 is, and pushes us all into this unfair discrimination analysis. You do not need to reach, this court does not need to reach, any question of unfair discrimination to resolve this case. If you agree with me that 510A and 1129A1 make the subordination agreement enforceable and that 1129B1 does not negate A1, then this appeal is over without any need to reach the question of unfair discrimination. But if we don't agree with you on that, then what's the next point? The next is to get to the unfair discrimination question. And Mr. Johnston said we're playing with words to get to the 53.4%. Well, the word we're playing with is the word discrimination, which always involves a comparison between the favored and the disfavored parties in every area of the law. 1E gets 21.9 cents on the dollar, aside from the subordination agreements. 1F gets 33.6 cents on the dollar. That is a 53.4% difference. It comes out to about $15 million. And that second 33.6 is aside from the subordination agreements. Is that correct? The 1F gets 33.6. Includes the subordination agreements in part, does it not? Well, in terms of how the numbers were put together, the amounts that would have gone to the EGI and phones note holders were taken away from them. The parties that subordinated to you. And they were put into a big pool, which was then equalized between 1E and 1F, instead of going entirely to my clients. That's how the numbers get to be what they are. But the retirees, the trade, they would have gotten what, absent taking into account any amounts coming to them from the subordination agreements? I'm not aware that that number is on the record. It may be, but it is. It's not what I have. It's 327 that said what they got. For some reason it hit me like 17-something. Maybe I'm wrong. I don't know. I was looking at JA 327. What does it say? 17.5. Yeah, I thought it was 17.5. I'm just trying to get the facts here. So do they go from 17.5 to 33.6 as a result of being able to have some divvying up to them of the amounts that are in subordinated sums? I assume that's right. We're holders of about $700 million of claims. And they're holders of, in very rough terms, half that. So any dollar figure is going to have twice as large an impact on them as it does on us. But that's as far as I want to carry the analysis without being sure of what I'm talking about. Can you clarify for us, because there are different figures that appear on 327, 328, and 329, what those variations are on the subordination distribution? Those pages are lengthy charts. And I was not a participant in the proceedings below. I'm not able to do that very quickly at the lectern, I'm afraid. Okay. Thank you very much. Thank you for all counsel for a very well presented. I have a question, Your Honor, if it would be helpful. Yes, sir. On JA327, first to answer Judge Ambrose's question, the trade and the retirees absent the benefit of the subordination pour over get 21.9%. And you can find that in the column that says plans prior to phone. Where it says pre-application or pre-subordination agreement. Correct. I got it. So that's 21.9%. The difference in the three pages, JA327, 328, 329, 330, is the subsequent pages assume a level of litigation trust recoveries, which you can see at the top. The first one says assuming hypothetical $250 million recovery, and then the next one is 500, the next one is 750. So that's the difference in the recoveries. All right. Thank you. As I did with the other two arguments, especially with this one, I think, for my sake, is if we could have a transcript prepared of your argument and then split it between your client, Mr. Johnson, and Mr. Englert, your client. No amount from Mr. Teitelbaum's client. Thank you very much. Pleasure having you here.